AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Michael Jayson Scarlett<br><br>Defendant(s) | )<br>)<br>) Case No.<br>)   6:23-mj- 1225<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __March 5, 2023__ in the county of __Orange__ in the __Middle__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841(b)(1)(A) | Conspiracy to distribute, and possess with intent to distribute a controlled substance, that is, 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers. |

This criminal complaint is based on these facts:
See affidavit

☒ Continued on the attached sheet.

_____
Complainant's signature

Timothy McGraw, SA, DEA
Printed name and title

Sworn to before me over video conference and signed by me pursuant to Fed.R.Crim. P. 4.1 and 4(d)

Date: 3/6/23

_____
Judge's signature

City and state: Orlando, Florida

LESLIE HOFFMAN PRICE, U.S. Magistrate Judge
Printed name and title

STATE OF FLORIDA           Case No.: 6:23-mj-

COUNTY OF ORANGE

## AFFIDAVIT IN SUPPORT OF THE ISSUANCE OF A COMPLAINT

I, Timothy K. McGraw, being duly sworn, do hereby depose and state as follows:

### INTRODUCTION

1. I am a Special Agent (SA) with the Drug Enforcement Administration (DEA) and have been so employed since January 2011. As a DEA SA, I am an "investigator or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States, who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516(1).

2. As a graduate of the DEA Training Academy, I have received specialized training in the areas of drug trafficking and money laundering. I have personally been involved with investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as the methods used to finance drug trafficking and launder drug proceeds.

3. I have been trained in the methods that drug traffickers use to distribute controlled substances and I am familiar with the means by which drug traffickers manage, transport, and conceal the proceeds of their drug trafficking activities.

4. During my tenure with the DEA, I have participated in narcotics investigations and I am familiar with, and have participated in, all normal methods

of investigation, including, but not limited to, visual surveillance, controlled deliveries, interviewing of witnesses, the execution of arrest warrants, the use of confidential informants and sources, the use of pen registers and trap and trace devices, the installation and use of GPS mobile tracking devices, and the use of electronic recording/listening devices. During my employment with the DEA, I have also utilized court-authorized prospective cell-phone geo-location information in the investigation of narcotics offenses and have participated in Title III wiretap investigations.

## PURPOSE OF AFFIDAVIT

5. This affidavit is based upon knowledge that I have acquired during an investigation of drug trafficking criminal activities committed by persons in the Middle District of Florida. This affidavit is based upon my personal knowledge, training and experience as a law enforcement officer, information that I received from other law enforcement officers and agents, and information received from other investigative means to include surveillance.

6. The statements contained in this affidavit are based in part on information from other DEA Task Force Officers and agents of the Orange County Sheriff's Office (OCSO), the Florida Highway Patrol (FHP), and members of the Metropolitan Bureau of Investigation (MBI) in Orlando, Florida. Further, because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint, I have not included every fact or facet of the investigation known to me, only enough to establish probable cause for the issuance

of a criminal complaint against Michael Jayson SCARLETT.

7. As set forth in more detail below, I believe there is probable cause to believe that on or about March 5, 2023, SCARLETT did knowingly and willfully conspire with other persons, both known and unknown, to distribute and possess with intent to distribute a controlled substance. The violation involved 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).

## PROBABLE CAUSE

8. On March 5, 2023, the DEA and the MBI conducted a narcotics interdiction operation at the Orlando International Airport (OIA). The operation focused on inbound source flights from locations where agents have located narcotics in the past and have knowledge of drug trafficking activities which have occurred in these areas.

9. At approximately 6:42 A.M., agents were working the inbound United Airlines Flight 1730 which had arrived from the Los Angeles International Airport (LAX). Los Angeles is a well-documented source city for controlled substances. It is also a well-documented city where drug traffickers and money launderers transport bulk United States currency related to drug trafficking.

10. MBI Agent Derek Coll utilized his trained and certified narcotics detection canine "Gabi" to conduct a sniff of several suitcases placed in a line from

the flight. Canine Gabi was born in April of 2014. Gabi has been certified by the Apopka Police Department and the Orlando Police Department in the detection of odors of illegal narcotics, including marijuana, cocaine HCL, cocaine base, heroin, methamphetamine, MDMA. Agent Derek Coll is Gabi's handler. Agent Coll is a duly sworn law enforcement officer with the Metropolitan Bureau of Investigation. Agent Coll has worked as Gabi's since January 2015. Agent Coll and Gabi train on a regular basis, on all odors the dog is trained to detect. This on-going training averages 16 hours per month. The suitcases were placed in an area to be free of any illegal drugs or drug odors. Agent Coll utilized canine Gabi and conducted a sniff of the area where the suitcases were placed. Agent Coll advised Canine Gabi positively alerted to the presence of the odor of illegal narcotics emitting from a light gray suitcase.

11. Based upon the Gabi's alert and the fact the flight originated from a well-documented source city for controlled substances, agents decided to observe who took custody of the suitcase when it was placed onto the baggage claim carousel. The plan was for the agents to make contact with the person(s) who retrieved the suitcase and conduct a consensual interview of the person(s) regarding their travel and checked baggage. MBI Agent Joshua Evans noted the United Airlines luggage tag for the suitcases displayed the name SCARLETT/MIC, who was later identified as SCARLETT with a date of birth of xx/xx/1979. MBI Sergeant George Wood and Agent Coll maintained custody and control of the subject suitcase.

12. Agent Evans, MBI Agent Jason McSpadden, MBI Agent Rafael Baez, and MBI Agent Quincy Alleyne conducted surveillance near United Airlines carousel 22 where the bags were being picked up by the travelers of United Airlines Flight 1730. Agent Evans advised Sergeant Wood that agents were ready to observe the suitcase arrive to the baggage carousel 22. Sergeant Wood and Agent Coll placed the light gray suitcase onto the baggage conveyor belt, and they observed the bag travel to the baggage carousel 22 where Agent Evans observed the luggage travel on carousel 22. Agent Alleyne observed SCARLETT remove the light gray suitcase from carousel 22 as well as a brown suitcase from carousel 22. Agent Evans observed SCARLETT standing near carousel 22 with the light gray suitcase and brown suitcase directly beside him. Agent Evans observed SCARLETT was speaking into a cell phone, and SCARLETT was nervously pacing back and forth.

13. Agent Evans and Agent Baez approached and made contact with SCARLETT. Agent Evans and Agent Baez identified themselves with their law enforcement credentials. Agent Evans advised SCARLETT he was conducting an investigation based upon a narcotics K9 alert on the light gray suitcase. Agent Evans asked SCARLETT if the gray and brown suitcases belonged to him. SCARLETT advised the gray and brown suitcases were his suitcases, and SCARLETT advised his name was printed on the luggage tags affixed to the suitcases. Agent Evans asked SCARLETT the purpose of his travel. SCARLETT advised he was staying in Orlando for only a couple of days while looking for work. Agent Evans asked SCARLETT if he packed the suitcases, and SCARLETT advised his wife packed the

suitcases. Agent Evans requested SCARLETT'S identification and boarding pass for the flight. SCARLETT provided a California driver's license and boarding pass to Agent Baez. Agent Baez photographed the California driver's license and boarding pass, and handed them back to SCARLETT.

14. Agent Evans, as witnessed by Agent Baez, requested consent for law enforcement to search the light gray and brown suitcases. SCARLETT provided verbal consent to search both suitcases. Agent McSpadden was nearby and walked over to assist with the search of the suitcases. Agent McSpadden searched the light gray suitcase. He discovered suspected drugs inside of vacuum-sealed bags within the light gray suitcase. Agent McSpadden notified Agent Evans and Agent Baez that he discovered suspected drugs in the suitcase. Agent Evans, Agent McSpadden, and Agent Baez secured SCARLETT in handcuffs pending the continued investigation into the suspected drugs located inside the light gray suitcase.

15. Agents walked with SCARLETT to the Orlando Police Department (OPD) substation inside OIA to continue the investigation. I transported the brown suitcase to the OPD office while Agent McSpadden transported the light gray suitcase to the OPD office. SCARLETT was placed inside an interview room. The two suitcases were placed inside the OPD office where Agent Evans and I continued the search of the light-gray suitcase and brown suitcase. Agent Evans and I located multiple items inside of the light-gray suitcase to include a pillow, shoes, numerous dryer sheets, and vacuum-sealed bags of suspected marijuana and suspected methamphetamine. The vacuum-sealed bags were wrapped in towels. Agent Evans

and I located numerous items inside of the brown suitcase to include a pillow, shoes, numerous dryer sheets, and vacuum-sealed bags of suspected marijuana and suspected methamphetamine. The vacuum-sealed bags were wrapped in towels. The two suitcases contained approximately 4 pounds of suspected marijuana and approximately 38 pounds of suspected methamphetamine. The suspected marijuana and suspected methamphetamine were seized by the DEA and later processed as evidence. In addition, the suspected methamphetamine was later field tested at the DEA office, and the test resulted in a presumptive positive presence of methamphetamine. The suspected marijuana has not been field tested at this time.

16. Agent Evans and I returned to the interview room with SCARLETT. DEA TFO Garrett Dunn and Sergeant George Wood remained inside the OPD office with the suspected methamphetamine, marijuana, and luggage items. I witnessed Agent Evans advise SCARLETT of his *Miranda* rights. SCARLETT agreed to speak with the agents. SCARLETT advised he knew he messed up, and SCARLETT advised he knew he was in a lot of trouble. SCARLETT also advised he deserved the trouble he was facing. SCARLETT advised he knew what he was doing was risky whether he had full knowledge of what was inside the two suitcases. SCARLETT advised he wanted to cooperate with the investigation. SCARLETT advised a person known to him as "Chewy" approached him, and "Chewy" offered him $500 to transport the suitcases to Orlando. SCARLETT advised he has transported suitcases for "Chewy" on two previous occasions to Orlando, Florida. SCARLETT advised he was told by "Chewy" the suitcases he transported on the

two previous occasions contained only marijuana. SCARLETT advised "Chewy" told him this at some point in the recent past. SCARLETT advised Agent Evans and me that he did not know what was inside the gray and brown suitcases, but SCARLETT admitted he knew it was drug related based upon the previous trips, past conversations with "Chewy," their history together, and the fact SCARLETT received $500 for transporting suitcases.

17. SCARLETT advised "Chewy" paid for his airline tickets this trip and the two previous trips. SCARLETT advised he has received $500 cash from "Chewy" for each of the three trips, and SCARLETT would also receive cash to reimburse him for his return flight from Florida to California. SCARLETT advised he also received flight reimbursement from unknown subjects in the Orlando area when SCARLETT gave them the suitcases on the two previous trips to Orlando, FL. SCARLETT explained he never stayed in Orlando, FL very long on the two previous trips. SCARLETT explained during the first trip he arrived, was picked up by an unknown black male, and driven to a nearby store where he and the black male purchased a drink. SCARLETT gave the black male the suitcase(s), and the black male asked if SCARLETT wanted to stay or return home. SCARLETT advised he wanted to return home. The black male gave him money for the airline ticket and drove SCARLETT back to OIA.

18. SCARLETT explained during his second trip he arrived, was picked up by two unknown black males, and he was driven to a nearby hotel. SCARLETT told the males he was tired, and SCARLETT wanted to sleep. SCARLETT advised he

slept for a while, woke up, and called someone who came to pick him up and drove him back to OIA for his flight back to California.

19. SCARLETT stated that a couple of weeks ago, he went with "Chewy" to a storage unit, and "Chewy" removed methamphetamine from the storage unit. SCARLETT advised that on February 28, 2023, "Chewy" brought a clean pound of methamphetamine to the storage unit and swapped it out for a dirty pound of methamphetamine. SCARLETT explained SCARLETT has a history of dealing in methamphetamine. SCARLETT advised he knows how to clean it and process it for sale and distribution. SCARLETT explained he has cleaned methamphetamine with acetone for "Chewy" to make the methamphetamine clear, which is more appealing to the buyers of the methamphetamine.

20. I witnessed Agent Evans ask SCARLETT for consent to search SCARELTT's cell phone. SCARLETT provided verbal consent and SCARLETT provided his cell phone passcode. Agent Evans reviewed text messages between "Chewy" and SCARLETT wherein they discussed their recognition of law enforcement inside OIA prior to SCARLETT's arrest on this date. The text messages expressed how SCARLETT and "Chewy" observed individuals they believed were members of law enforcement, and their actions to avoid detection. The following is one such exchange observed in SCARLETT's cell phone. Note, this does not include each and every text message between SCARLETT and "Chewy."

> SCARLETT: Baggage claim 22. Yo. Hold up. Dude with blue hata. Watch.

> Chewy: Yea I seen him
>
> SCARLETT: He jumped in when we passed
>
> Chewy: With wire behind him kneck
>
> SCARLETT: Then I stopped. Your thought.
>
> Chewy: If clear pretend to grab wrong bag first then grab urs
>
> SCARLETT: Yeah I'll test. He stopped where there's three more dudes with backpacks.
>
> Chewy: Test first
>
> SCARLETT: Ok
>
> Chewy: Than grab. Than come out front door. If u hear me whistle while u going to Bag. Cxl and walk out
>
> SCARLETT: Ok
>
> Chewy: Good. Brown good. Test first. Just come out put bags back in belt. Come to front.

21. It was during this time that Agent Evans and I learned that "Chewy" was in OIA at the same time as SCARLETT. Agents asked SCARLETT if "Chewy" was on his same flight. SCARLETT advised he did not know if "Chewy" was on the same flight. SCARLETT advised he did not know that "Chewy" had planned to travel to Orlando, FL on the same flight. SCARLETT advised he saw "Chewy" as SCARLETT walked off the plane and through the terminal. SCARLETT advised they did not walk together, but SCARLETT knew "Chewy" was walking toward baggage claim. SCARLETT advised he believed he would have to pick up the two suitcases in baggage claim and meet someone at the arrivals exit as he had done two

previous times.

22. Agent Evans continued to review SCARLETT's cell phone, and Agent Evans observed various photographs of different types and quantities of drugs. Specifically, there was a picture observed that showed a backpack with what appeared to be crystal methamphetamine inside. SCARLETT advised Agent Evans and me that the photograph was taken at SCARLETT's residence. SCARLETT advised the methamphetamine belonged to "Chewy" and "Chewy" had brought it to SCARLETT's residence so SCARLETT could clean and prepare the methamphetamine for sale and distribution.

23. TFO Dunn and MBI Agent Juan Vargas searched SCARLETT's camouflage backpack pursuant to the verbal consent provided by SCARLETT. TFO Dunn located two United Airlines baggage tag receipts inside the backpack. The two baggage tag receipts matched up with the bag tags attached to the gray suitcase and brown suitcase. The baggage tag receipts and the bag tags attached to the suitcases displayed the unique numbers 6016514080 on the brown suitcase and 6016514079 on the gray suitcase. Also, TFO Dunn, as witnessed by TFO Edward Ferreira and myself, located a small clear baggie containing a crystal substance suspected to be crystal methamphetamine inside the pocket of a pair of pants inside the backpack. A field test was performed on the substance, and it produced a positive result for the presence of methamphetamine. This small baggie was seized and processed as evidence by the DEA. In addition, TFO Dunn and Agent Vargas located a small baggie containing a green leafy substance suspected to be marijuana. A field test was

not performed on the substance. It was seized by the DEA and processed as evidence.

24. SCARLETT's cell phone was seized as evidence by the DEA. In addition, the two suitcases, the personal items inside the checked suitcases, the packaging material that contained the methamphetamine and marijuana, and the backpack with personal items inside were seized as evidence by the DEA. TFO Dunn and I reviewed the items inside SCARLETT's wallet. There were various credit cards, membership cards, a California driver's license, an undetermined amount of United States currency, and one United Airlines boarding pass for a flight from Los Angeles, CA to Orlando, FL on February 11, 2023. The historical United Airlines boarding pass was seized as evidence by the DEA.

25. SCARLETT was informed of his arrest by the DEA on felony drug related charges. SCARLETT was transported to the Seminole County, Florida jail by Florida Highway Patrol Trooper Andrew Gillespie. Trooper Gillespie and I booked SCARLETT into the Seminole County jail.

## CONCLUSION

26. In light of the above, I submit there is probable cause to believe that on or about March 5, 2023, SCARLETT did knowingly and willfully conspire with other persons, both known and unknown, to distribute and possess with intent to distribute a controlled substance. The violation involved 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).

27. This concludes my affidavit.

Timothy McGraw, Special Agent
Drug Enforcement Administration

Affidavit submitted by email and attested to me as true and accurate via telephone or video conference, consistent with Fed. R. Crim. P. 4.1 and 4(d)(3), before me this __6th__ day of March, 2023.

LESLIE HOFFMAN PRICE
United States Magistrate Judge